UNITED STATES DISTRICT COURT
for the
WESTERN DISTRICT OF MISSOURI

Thomas R. McLean, MD            )
                                )
            Plaintiff,           )
                                )
        v.                       )
                                )   Civil Action No. #4:20-CV-593-BP
Margaret Bruce, as the Personal  )
Representative for the Estate of Jeffrey Bruce, )
                                )
            Defendant.           )

## PLAINTIFF'S STATEMENT OF UNCONTROVERTED FACTS

I, Thomas R. McLean, MD, the *pro se* Plaintiff in this case, declare:

1. On or about February 2011, I retained the Defendant to represent me before the Department of Veterans Affairs ("VA" or "Agency"). The Defendant subsequently made appearances on my behalf before the 2011 Administrative Investigatory Board ("AIB"), during both Disciplinary Advisory Boards ("DAB") hearings, and in Kansas District Court (*see infra*).

2. On August 6, 2010, after I was passed over to become the Chief of Surgery, I filed a complaint with the Office of Special Counsel ("OSC") asserting that the Agency had engaged in prohibited personnel practices in violation of 5 U.S.C. §2302(b)(4) and (6). Exhibit 15 E.

3. The day after the OSC closed its investigation into my complaint (January 25, 2011), I was placed on administrative leave allegedly for my management of two cases (the hernia and appendix cases).

4. In March 2011, I was the target of an AIB (Exhibit 15 P); and subsequently, I was allegedly appointed to a Focused Profession Plan Evaluation ("FPPE") based allegedly on the 2011 AIB's recommendations (Exhibit 15 Q).

5. During this FPPE, Drs. Van Landingham and Montecino served as my proctors. Exhibit 15 BB.

6. In March 2012, I testified before the Malik AIB. I testified that Drs. Van Landingham and Montecino had engaged in repeated acts of substantial and specific patient harm. Exhibits 15 JJ and KK.
7. Two months later (on May 31, 2012 (Exhibit 15 QQ), after a secretive *ex parte* Professional Standard Board ("PSB") (Exhibit PP) was held, (wherein Drs. Van Landingham and Montecino made derogatory statements concerning my surgical skills), I was placed on Summary Suspension.
8. In 2013, I removed from the VA. Exhibit 15 VV.
9. My removal was appealed to a Disciplinary Advisory Board ("DAB") in 2013. To avoid producing evidence that demonstrated it had violated my due process rights, the Agency reinstated me on paper. Exhibit WW. (Having been reinstated, the DAB no longer had jurisdiction to hear my appeal.)
10. I was again removed in 2014 for clinical incompetency and being non-rehabilitatable. Exhibit EEE. The key evidence, cited by the Agency in support of my removal, was testimony by Drs. Van Landingham and Montecino; and their allegedly contemporaneously created FPPE proctors notes. Exhibit 15 SS.
11. The 2014 DAB sustained my 2014 removal; and this decision became final on or about December 2014.
12. On about December 2014, I made an offer to the Defendant to stay on and appeal my removal to the OSC. Exhibit 15 FFF.
13. Mr. Bruce's acceptance of this offer was manifested by his conduct; specifically, by accepting my check for $50,000 in early 2015 (Exhibit 1); and subsequently, by statements he made via text messaging (Exhibit 2).
14. Mr. Bruce has admitted that at all relevant times between 2015 and 2020, an attorney client relationship existed between the parties. Exhibits 3 and 4 (Q 7-13).
15. After cashing my $50,000 check, Mr. Bruce told me that his strategy had changed: He was going to file an EEOC claim in Kansas District Court (2:15-cv-2634).
    a. When asked why his strategy had changed, Mr. Bruce stated that the Agency had refused to provide him with a copy of the 2014 DAB transcript unless he paid the Agency "thousands of dollars;" and that a copy of the 2014 transcript was

required to file a complaint with the OSC. (I subsequently learned the later statement was a lie.)[1]

b. Under the Defendant's new strategy, by filing an EEOC action, he would obtain a copy of the 2014 DAB transcript through discovery.

c. The Defendant added that even if I were to lose on the EEOC claim, he could still file a claim with the OSC because the OSC claim "sounded in equity." According to the Defendant, he had unlimited time to file with OSC. (A position he would continue to articulate for the next five years; *see* Exhibit 2).

16. On or about March 2016, Mr. Bruce told me that he was going to withdraw his EEOC action because it had become clear to him that the judge was not going to order the Agency to produce a copy of the 2014 DAB transcript.

17. On or about the time the Defendant made the decision to withdraw the EEOC complaint, the Defendant demanded an additional $10,000.00 to replenish the money he had earned working on the EEOC action (Exhibit 5).

18. Between April of 2016 and May 1, 2020, the Defendant alternatively claimed to be facing some sort of family emergency on the one hand (*e.g.*, he had prostate cancer, he suffered from incapacitating back pain, his wife needed care because she had polycythemia vera, one of his children needed to be rescued, or his sister died[2]); and on the other hand, he alleged that he was actively engaged in moving my OSC claim forward. Exhibit 2.[3] Selected highlights of the Defendant's assurances that he was working on my behalf are found in Exhibit 2 and include (but are not limited to):

i. August 25, 2018, the Defendant claimed that he would soon be arranging a meeting with me to discuss filing with the OSC. Such a meeting never occurred.

ii. On September 3, 2018, the Defendant offered to email me a draft copy of the statement of claim (which implied that he would be filing). The Defendant never sent a statement of claims to me.

---

[1] Indeed, I had a right to a copy of my transcript.

[2] Plaintiff has a copy of the Defendant's obituary on file. Mr. Bruce's sister survived his death.

[3] Although Exhibit 2 covers the year 2018 to 2020, it is representative of all communications between the parties between 2016 and 2020. (Text messages for 2016-2018 are not available because I lost my cell phone in 2018.)

iii. On December 31, 2018, the Defendant stated that he was waiting for the OSC to return his call.
iv. On January 29, 2019, the Defendant wrote to Dr. McLean that the OSC had notified him that it was "extremely backlogged." (The Defendant told the Court that no record or memorization of his communications with OSC existed. ECF 111.)
v. On March 31, 2019, the Defendant wrote that he would be contacting me "later this week … for filing purposes." No contact occurred.
vi. On June 18, 2019, the Defendant wrote that his "OSC complaint will be filed by this Friday."
vii. On September 21, 2019, the Defendant wrote that he would be filing with the OSC as soon as he solved some technical issues.
viii. On November 24, 2019, the Defendant wrote to assure Dr. McLean that he had not abandoned Dr. McLean.
ix. On March 6, 2020, the Defendant wrote that he was copying documents and would "finalize the OSC complaint and file next week."
x. On April 29, 2020, the Defendant wrote to Dr. McLean that "the OSC complaint will be filed by Friday May 1."

19. In April 2020, Dr. McLean obtained a second opinion on his ability to file a claim with the OSC from Passman & Kaplan ("P&K"). P&K declined to take Dr. McLean on as a client because his OSC claim was non-viable (because Dr. McLean had waited too long to file). Exhibit 6.
20. The Defendant admitted that he never filed an OSC claim on my behalf – and never offered any reason for why he did not file. Exhibit 7.
21. Dr. McLean terminated his professional relationship with the Defendant on May 1, 2020.
22. After 2017, the OSC no longer had to consider any claim file more than three years after the final agency action.[4] 5 U.S.C. §1214(a)(6)(A)(iii).
23. The declarations by my medical expert witness (Dr. Heymach (Exhibit 8)) and by my vocational expert witness (Ms. Franks (Exhibit 9)) demonstrate that I am no longer

---

[4] Plaintiff first learned of this rule in 2021.

employable as a surgeon because I have not been actively engage in the practice of medicine.

24. In a declaration that authenticate and supplemented his expert witness report, my legal expert witness, Mr. Eric Pines, stated that Mr. Bruce's management of my case was below the standard of care and that had Mr. Bruce filed a timely complaint with the OSC on my behalf, I would have prevailed before the MSPB. Exhibit 10; *see also* Exhibit 10(a) at page 25 line 23 to page 26 line 1. Because the Defendant did not retain a legal expert witness, Mr. Pines' opinion is uncontroverted.

25. After this case had been filed, on or about September 2020, I filed a claim with the OSC. Although, the OSC declined to investigate my claim based on latches (Exhibit 11), the OSC did issue me an Independent Right of Action ("IRA") (Exhibit 12).

    a. Normally, when the OSC takes on a whistleblower case, it conducts an investigation.[5] If the OSC's investigation reveals that the complaint has merit, the OSC files a whistleblower complaint (on behalf of the claimant) with the appropriate MSPB.[6]

    b. If the OSC declines to investigate or declines to file a claim with the appropriate MSPB on a claimant's behalf, the OSC *may* issue the claimant an IRA.[7] (The Plaintiff is unaware of any statute or regulation that mandates the OSC must issue an IRA when it declines to investigate a whistleblower complaint.)

    c. In short, an IRA allows the claimant to take his whistleblower complaint directly to the MSPB;[8] and it is the MSPB that ultimately rules on OSC complaints.[9]

---

[5] Honorable Carolyn N. Lerner and Jason M. Zuckerman: *The U.S. Office of Special Counsel's Role in Protecting Whistleblowers and Serving as a Safe Channel for Government Employees to Disclose Wrongdoing*; page 2-5; available at:
https://osc.gov/Documents/PPP/OSC%27s%20Role/OSC%E2%80%99s%20Role%20in%20Protecting%20Whistleblowers%20and%20Serving%20as%20a%20Safe%20Channel%20for%20Government%20Employees%20to%20Disclose%20Wrongdoing.pdf.

[6] Id.

[7] Id.

[8] Id.

[9] Regardless of whether the OSC brings a whistleblower complaint directly to the MSPB or a former government employee obtains an IRA from the OSC and then files with the MSPB, it is always the MSPB that decides the outcome of whistleblower cases.

26. In June of 2021, Dr. Haller was deposed. Exhibit 13.
27. In March 2022, I filed an IRA complaint with the Denver MSPB; and the later ruled in May 2022 that it had jurisdiction to hear my IRA claim because I had established two non-frivolous cases of whistleblower retaliation.
28. I have had all the documents listed in the docket for DE-1221-22-0142-W-2 (my pending case before the Denver MSBP) certified by the clerk for the Washington MSPB. (Exhibit 14). Three of the documents on the docket have no relevance here because the concern housekeeping matters. The remaining thirty-five documents on the docket of DE-1221-22-0142-W-2 are relevant and are being produced as Exhibits 15 to 18.
29. On March 10, 2023, Dr. McLean (Exhibit 15) and the VA filed their Closing Briefs (Exhibit 16) with the Denver MSPB; and on March 24, 2023, Dr. McLean (Exhibits 17) and the Agency filed their sur-replies to the Closing Briefs (Exhibits 18).
30. After the May 24th sur-replies were filed, the MSPB's administrative record was closed.
31. On July 11, 2023, the MSPB suspended the proceedings in the above action. A copy of this document was produced in ECF 272.

## DECLARATION

I declare under penalty of perjury, of the laws of the United States, that the above statements are true to the best of my knowledge.

## Certificate of Service

I hereby certify that this pleading was served upon Mr. Meyers via his email.

Respectfully submitted August 3, 2023, by:

Thomas R. McLean, Plaintiff *pro se*
4970 Park
Shawnee, KS, 66216
913-525-5526
tmcllc1999@gmail.com